## TARRENCE v. COMMONWEALTH.

Court of Appeals of Kentucky.

Dec. 18, 1953.

Rehearing Denied March 19, 1954.

STANLEY, Commissioner.

The story of the murder of Francis J. McCormick is told in the opinion of Tarrence v. Commonwealth, Ky., 265 S.W. 2d 40. This is the appeal of his son, Leonard Tarrence, from a judgment condemning him to death also for his participation in the crime. The only error claimed is the admission of the defendant's confession.

The overruled demurrer to the indictment and motions for change of venue and continuance were joint. When the appellant was placed on trial about three weeks after his father was convicted, he pleaded guilty. The court was careful to see that the defendant personally and voluntarily entered the plea and clearly understood the consequences. Sec. 173, Criminal Code of Practice. The effect of a plea of guilty is to waive all defenses other than that the indictment charges no offense and to authorize the imposition of the penalty prescribed by law. Clift v. Commonwealth, 268 Ky. 573, 105 S.W.2d 557; 22 C.J.S., Criminal Law, § 424. The statute requires that in a case which may be punishable by death a jury shall fix the penalty, which for murder is either confinement in a penitentiary for life or death. KRS 431.130, 435.-010.

The Commonwealth presented to the jury substantially the same evidence, except the threats, introduced in the trial of Roy Tarrence.

The objection to the admissibility of the confession is that it was made under the influence of assurance by the Commonwealth's attorney that he would recommend life imprisonment for Leonard rather than the death penalty if he would confess the crime and that was not being done. This assurance related only to the son. None was ever given the father. He confessed the crime under the same influence, he contended, in order to save his son from the death penalty. The facts and conclusion should be read into the opinion in the father's case, for he too challenged the admissibility of the joint confession.

Sandy Paniello, Louisville, for appellant.

J. D. Buckman, Atty. Gen., H. D. Reed, Jr., Asst. Atty. Gen., for appellee.

■ The general rule on the point was long ago recognized by this court to be that "confessions induced by hope or fear raised by promises or threats of the prosecutor, or of any person having authority over the prisoner at the time, are not considered voluntary, but as having been made under mental duress, and are not competent evidence." Rector v. Commonwealth, 80 Ky. 468, 4 Ky.Law Rep. 323. The indisputable principle has been observed in several cases, a late one being Hager v. Commonwealth, 300 Ky. 585, 189 S.W.2d 867.

It seems well to give a full account of the evidence regarding the confession.

Before either trial, a hearing was had before the judge on motions to suppress the confessions. The evidence is that a warrant had been issued for Leonard Tarrence the day after the assault. Four days later he surrendered to Judge Mix, one of the judges of the criminal branch, and to the chief of police. Judge Mix advised Leonard he was not required to say anything about the case, and asked Mr. Foster Stone, an attorney, to counsel with him. The other facts pertinent to the question are, in brief, that it was not known whether McCormick was dead or alive. Mr. Stone, having knowledge of the strong circumstantial evidence against Tarrence, urged him to reveal McCormick's whereabouts that he might receive medical attention. After the lapse of several days, in the belief that he was dead, McCormick's family became anxious to recover the body that he might have a Christian burial. Mr. Stone, testifying with explicit waiver and consent, related his counseling of Tarrence and his efforts to have the Commonwealth's attorney agree not to insist on the death penalty if Tarrence would make an immediate disclosure of the facts. Mr. Hamilton was given a letter signed by McCormick's widow and son agreeing to this. Recognizing the possible impropriety of doing so, Mr. Hamilton consulted with Judge Mix, the president and other officers of the local bar association, McCormick's law partner, and with the police authorities. He then advised Stone he would make such recommendation, and he in turn advised Tarrence. In fact, it seems Mrs. McCormick's letter was shown him. Tarrence indicated a willingness to comply and asked that he be taken to his home to see his father and mother. He was conducted there and talked with them in the presence but without the hearing of the officers. A warrant had previously issued for Roy Tarrence but service was being withheld on the idea that he might do something that would give a clue to the whereabouts of McCormick. The father and mother advised their son, in the hearing of the officers, that he ought not confess as he was innocent. Leonard afterward told Mr. Stone that he would not agree and "just to let it ride like it is." On the return trip in the automobile with his lawyer and police officers, Stone told him that unless he told all, he, the lawyer, could do nothing for him. Subsequent events make it clear that the offer of leniency for a confession was withdrawn and the prisoner was so advised.

Mr. Stone had to leave the city about noon the next day. He testified that Mr. Hamilton had withdrawn the offer but he does not clearly say that he had directly told his client of that fact. However, he told his client's mother just before she went into the jail and visited him and her husband. This was on Thursday or Friday, which was, as we understand, the day before the trip to Harrods Creek and the recovery of the body.

Mr. Hamilton related the circumstances of the offer not to insist on the death penalty on condition that Leonard Tarrence make the disclosures described. Concerning the withdrawal of the offer he very positively testified that at the jail he made it clear to Mrs. Tarrence and Mr. Stone that the offer to recommend leniency was cancelled and that he would make no such recommendation. The sheriff had sent for him the day before the trip to Harrods Creek as Leonard wanted to make a statement. He then told Leonard that he did not have to make any statement but if it would clear his conscience, he could do so; that whatever he might say would be used against him "and you can throw yourself

on the mercy of God; there is nothing I can do for you." His response was "in spite of that" he wanted to make a statement and wanted Judge Mix to be present. In the Judge's presence, Hamilton repeated his statements to Tarrence and he repeated that he wanted to tell all he knew about the matter and to take the officers to the body. He said he did not care whether Mr. Stone was present or not and seemed to realize that he had withdrawn from the case.

Neither defendant testified on the hearing.

The court overruled the joint motion to suppress the confessions before the trial of Roy Tarrence.

We look to the evidence introduced on the trial of the appellant, Leonard Tarrence.

Sheriff Bax testified that on Saturday morning, March 8 (10 days after the abduction and 5 days after Leonard's arrest) Leonard asked to see his father, who was also in jail. That could not be arranged. In the course of their conversation he told the sheriff that he wanted to show him where the body was "and get this thing over with." He asked whether "that deal would stand up that was made" and Mr. Bax told him he had nothing to do with it. Tarrence responded, "Well, that would be alright." At the officer's suggestion, Mr. Hamilton, the Commonwealth's attorney, came to the jail. He warned the prisoner clearly and certainly before he said anything that there was no "deal in effect" and that anything he said could be used against him. Tarrence replied that was perfectly all right and asked to talk with Judge Mix and have him go along to recover the body. Judge Mix gave him the same warning and consented to accompany the party on the boy's insistence. They went to Harrods Creek where Tarrence located the body under the water. In reply to an inquiry as to how they got the man down from the road to the point, which was about 400 feet, Tarrence said that he had walked down. He further stated the only thing that McCormick had said was that "whatever you are going to do, do it and get it over with." He freely made other statements which reveal a brutal and cold-blooded murder at the creek.

The sheriff further testified to the giving of a signed confession by the father and the son at the jail at 12:20 A.M. March 12, 1952, and filed it. The confession reads:

"Leonard Tarrence and Roy Tarrence state that we left Jeffersontown post office on February 28, 1952, and came into Louisville around four o'clock p. m. We seen Mr. McCormick at Fourth and Oak and as he went down the alley we both nailed him and we beat him out of the car and we drive up to Harrods Creek with him; then we get him out of the car and we both hit him and beat him again down on the creek bank with a club and with fists. After hitting him we looked for a weight and a piece of wire to fasten the weight to him and pushed him into the creek. He did not go out very far and Leonard pushed him out with a rod; then we came back home arriving home about eight o'clock p.m.

"We wish to say that this statement was made voluntarily by each of us and we requested Mr. Bernard J. Bax, Sheriff of Jefferson County, Kentucky, to permit us to make the statement, and also requested to speak to a priest at the Jefferson county jail before making the statement we spoke to the priest for approximately a half hour immediately before this confession was made.

"I, Leonard Tarrence wish to also state that I can read and that I have read the foregoing which is true; that I also read aloud said statement to my father, Roy Tarrence, who cannot read."

Mr. Hamilton and Mr. Stone, called by the defendant, testified before the jury, but with less detail than at the preliminary hearing, as to the offer of leniency on condition that Leonard Tarrence identify his accomplice, locate the body, and plead

guilty. The withdrawal and related circumstances were brought out.

On the father's trial, the sheriff testified that on the Tuesday night following recovery of the body, he went to Roy Tarrence's cell at his request, and that he told the sheriff he wanted to make a confession and for him to notify his son; also, that he wanted to talk to a priest. A priest was called, and both accused men conferred with him alone. The substance and effect of the sheriff's testimony concerning the making of the confession leaves no doubt that it was voluntary. During the course of the trial, the father testified in chambers that he did not know the offer of leniency for his son had been withdrawn. Yet, he admitted that Leonard had told him in the presence of the officers that he had made a confession and had taken the officers to recover the body. He admitted that he had told the sheriff before the written confession was made "he wanted to get right with God" and wanted to talk with a priest. He categorically testified that no one forced him to make it but that he "just worried myself crazy."

Leonard testified on his father's trial that the confession was not true, particularly that they had killed the man at the creek, and insisted that McCormick had died in the alley where he was assaulted. He made no sort of claim that the confession had been given on account of any promise of leniency; in fact, that was not mentioned by him. He had wanted to talk with the priest since he had made a "big mistake" and wanted "to try to get forgiveness."

█ Whether a confession was voluntarily made and, therefore, admissible in evidence, is primarily a question for the trial judge to decide, KRS 422.110, and where the decision rests on an issue of fact, it will not be disturbed unless it satisfactorily appears that the evidence supporting the decision was insufficient. Laughlin v. Commonwealth, 37 S.W. 590, 18 Ky.Law Rep. 640; Pearsall v. Commonwealth, 92 S.W. 589, 29 Ky.Law Rep. 222. We are quite convinced that the present confession was voluntary. If the assurance of leniency had been dispelled by the intervening circumstances, or positively withdrawn by the Commonwealth's attorney, and the accused knew it, the inducement ceased to operate on his mind. It cannot be said in this case that either defendant yielded in consequence of the promise of mitigation. See Roberson's Ky.Crim.Law, Sec. 1814; Howard v. Commonwealth, 90 S.W. 578, 28 Ky.Law Rep. 737. Remorse and repentance, rather than the promise, seem to have moved these men to confess their horrible crime. The confession only fortified other abundant evidence of their guilt. The court, therefore, properly admitted it in evidence. This trial, as was that of the father, was without error.

The judgment is affirmed.